Argued and submitted September 21, 1987, resubmitted In Banc May 4, affirmed October 12, reconsideration denied December 9, 1988, petition for review denied January 4, 1989 (307 Or 303)

## STATE OF OREGON,
*Respondent,*

*v.*

## CHARLES JAMES DONAHUE,
*Appellant.*

(10-86-02896; CA A42583)

762 P2d 1022

Robert J. Smith, Eugene, argued the cause and filed the brief for appellant.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Stephen F. Peifer, Assistant Attorney General, Salem.

RICHARDSON, J.

Warren, J., dissenting.

## RICHARDSON, J.

Defendant appeals his conviction for unlawful manufacture and possession of a controlled substance. He contends that the trial court erred in denying his motion to suppress evidence seized from a building on his property during the execution of a search warrant.

The warrant was based on an affidavit by Detective Gourley of the Oregon State Police. The sufficiency of that affidavit was the primary issue presented by defendant's motion to suppress. He contends that there was no showing of probable cause to believe that he was growing marijuana in the building. We affirm.

The first several paragraphs of the affidavit set out Gourley's training, experience and knowledge about indoor marijuana growing. The next several paragraphs relate information provided by two named informants. The first informant owned a building supply store and stated that he sold a large amount of plywood to defendant in the winter of 1984. He later noticed several individuals using plywood to line the interior of a large metal building on defendant's property. He drove by the building later and noticed what he describes as a "false wall" built inside the building. The informant also stated that a young man who lives on the property purchased 19 rolls of heavy duty string on two occasions at his establishment. According to the affiant, his experience is that string is used by marijuana growers to secure the plants while they are growing and to hang them for drying after harvesting.

The affidavit discloses that the second informant was defendant's neighbor. He described defendant as "unfriendly," noting that the informant's children were not allowed to cross the property to get to a school bus stop. He noted also that a wire enclosure had been erected at the back of the building and that two German Shepherd dogs had been placed there. The neighbor corroborated the information provided by the lumber supply store owner that an interior wall had been constructed inside the metal building and that the windows had been covered up. Both informants indicated that they had seen no sign of any commercial activity in the building, even though the occupants of the property had told them that they intended to establish a woodworking shop.

A significant part of the affidavit concerned Gourley's investigation of the amount of electricity consumed in the metal building. He noted a substantial increase in power usage and compared power consumption patterns in the building to likely levels that would be used for indoor marijuana cultivation. The affidavit said:

"I have found that the power to that particular residence, which is addressed as 28600 Lingo Lane, Junction City, Oregon is provided by the Emerald Public Utilities District. Their records show that there is a separate meter for the metal building on the property. Copies of their records are herein incorporated as Attachments A, B & C. Attachment A is the power readings for the previous owners for the time period of May 10, 1984 through September 10, [1984]. Attachment B is the power reading for the previous owners for the time period of September 13, 1984 through January 10, 1985. Attachment C is the power readings for Mr. Donahue for the time period of May 10, 1985 through December 6, 1985. In reviewing Attachments A & B they show the lowest monthly recorded power consumption being 160 kilowatt hours and the highest being 453 kilowatt hours. Attachment C shows the lowest monthly recorded power consumption being 1566 kilowatt hours and the highest as being 6177 kilowatt hours. The majority of the recordings on Attachment C range in the 5000-6000 kilowatt hour bracket. On April 2, 1986 I contacted authorities of the Emerald PUD and learned that the power usage for the metal building obtained on March 7, 1986 was 5203 kilowatt hours.
* * *

"I know from my training and experience that it takes from three to six months to cultivate a crop of marijuana indoors to the point that it can be harvested. During that time the amount of light that is provided to the plants is increased to enhance the growth of the marijuana plants. In reviewing Attachment C a three month cycle can be seen where the power usage for the metal building climbs and then drops off to approximately 5000 kilowatt hours. I also know that persons that cultivate marijuana indoors frequently have crops of varying ages growing at the same time so that they can have a continual harvest. It is the plants that are nearing harvest that get the increased light. My training and experience also has shown me that marijuana growers will cut down the amount of light given to the plants in the last week before harvesting to simulate shorter days as would be present in the late fall when the plants would be nearing harvest in the outdoors. This is to facilitate a more enhanced 'bud' production to give the plant a chance to reproduce itself."

The day before the warrant was issued, Gourley went on the property with the power company's meter reader and, while there, saw a large exhaust fan and smelled the odor of growing marijuana coming from the fan's exhaust.

Defendant's general contention is that the search warrant affidavit did not establish probable cause to believe that the building contained evidence of a criminal activity. His more specific arguments are that the officer's observations while he was following the meter reader were the product of an illegal trespass and that the two named informants lack credibility.

■ We address the last contention first. The informants were named, their statuses, one a store owner and one a neighbor, were designated, and the direct observation basis of their information was disclosed. The information of each informant was corroborated by the independent statement of the other. The magistrate could properly credit the information supplied by the two informants.

■ ■ The officer's entry on defendant's land with the meter reader was a trespass in violation of Article I, section 9, of the Oregon Constitution, unless there was express or implied permission for his presence. *State v. Ohling,* 70 Or App 249, 688 P2d 1384, *rev den* 298 Or 334 (1984). The state argues that defendant does not have a reasonable expectation of privacy around the electric meter, because it is necessary for the meter reader to inspect it periodically. Additionally, the state argues, the expectation that the utility company will come on the property to service and read the meter is implied permission for persons to enter the area near the meter. *State v. Corbett,* 15 Or App 470, 516 P2d 487 (1973), *rev den* (1974). Although we can agree that there must be implied permission for a utility company employe to come on the property, we do not agree that that implied permission constitutes an open-ended waiver of defendant's privacy. The police officer went on the property for the purpose of obtaining evidence of a criminal law violation and was not acting within the scope of the implied permission for a meter reader to come on the property. The officer's trespass was unlawful, and the information derived from, that he saw an exhaust fan on the building and detected the odor of "growing marijuana," must be excluded from the search warrant affidavit.

■■ However, even after the information obtained by the trespass is deleted, the balance of the evidence in the affidavit is sufficient to support the issuing magistrate's conclusion that there was probable cause to issue a warrant. Probable cause means that the information on which the warrant is based must be such as could lead a reasonable person to determine that seizable things are probably to be found in the place designated to be searched. *State v. Anspach,* 298 Or 375, 692 P2d 602 (1984). Doubtful or marginal cases should generally be determined by the preference to be accorded search warrants. *United States v. Ventresca,* 380 US 102, 85 S Ct 741, 13 L Ed 2d 684 (1965); *State v. Tacker,* 241 Or 597, 407 P2d 851 (1965).

The parties' contentions as to the sufficiency of the affidavit revolve around *State v. Christen/Hankins,* 79 Or App 774, 720 P2d 1303 (1986). They argue that the facts here are sufficiently similar to reverse or sufficiently distinguishable to affirm the conviction. This case is somewhat similar to *Christen/Hankins* and also to *State v. Howe,* 88 Or App 595, 746 P2d 746 (1987), *rev den* 305 Or 274 (1988). However, trying to match fact patterns detours the inquiry from analysis to a search for factual distinctions from our precedents. There can be an infinite variety of fact situations, and each affidavit must be tested on its own merits.

■ The affidavit here sets forth the training and experience of the affiant officer regarding indoor marijuana growing operations current to that time. He swore that he had read instruction books on marijuana growing and other literature describing how it should be done. The existence of that literature and the number of cases in this court which have involved indoor marijuana production indicate that it is, to say the least, a fairly common enterprise with relatively settled characteristics.

The affidavit here recites a high consumption of electricity in an outbuilding that is not a residence. It also indicates that the consumption is consistent with the use of growing lights for marijuana production. The affiant demonstrates that the fluctuation in power consumption is correlated with the growing season of marijuana. Additionally, the windows of the structure were covered, which is, according to affiant, consistent with a desire for privacy as well as a need to

cut down heat loss. The internal wall also serves the same functions. Defendant told the neighbors to keep off his land and built an enclosure for guard dogs, indicating a desire for secrecy and privacy. He also told them that he was starting a woodworking business, which was his explanation for remodeling and using the outbuilding. However, the two named informants said that they had not seen any woodworking activity in or around the building at the time of high power consumption. Additionally, defendant installed an oil heating stove in the building and his compatriate purchased a large quantity of string. Taken as a whole, those facts permit the inference of an indoor marijuana growing enterprise.

■    Defendant suggests that high power consumption, a large supply of string, covered windows, guard dogs and an internal wall are also consistent with lawful activity. The fact that there may be more than one reasonable inference from facts does not defeat the issuing magistrate's finding of probable cause based upon one of those inferences. The information in an affidavit need not point to only one inference to the exclusion of all others. The issuing magistrate may properly consider other possible inferences when addressing whether there is probable cause to believe evidence of illicit activity will be found; however, probable cause may exist even if there are other equally plausible inferences from the stated facts. *See State v. Villagran,* 294 Or 404, 657 P2d 1223 (1983). In fact, the "legitimate enterprise" which defendant identified to his neighbors as going on in the building and which he suggested as the explanation for the power consumption and other activity was not evident.

Affirmed.

**WARREN, J.,** dissenting.

I disagree that the affidavit establishes that there was probable cause to believe that defendant was growing marijuana. Everything he did, according to the affidavit, was consistent with lawful activity. His unfriendly and secretive attitude may legitimately inspire curiosity as to what he was doing, but it does not suggest unlawful activity, much less a particular unlawful activity. Although his insulating the outbuildings and the use of large amounts of electrical power may

be consistent with marijuana growing, they are just as consistent with the growing of orchids or African violets and, given the evidence known to the officers, there is no reason to believe that he was more likely doing one than the other.

Consistency of the facts with a body of learning about the cultivation of marijuana in the abstract ought not to be, by itself, a sufficient basis for the issuance of a search warrant. In my view, there must be evidence that what defendant was doing was more consistent with growing marijuana than with some other activity.

*State v. Christen/Hankins,* 79 Or App 774, 720 P2d 1303 (1986), was such a case. The evidence there was like that in this case, except that there was additional evidence from an informant that the defendants were currently growing marijuana. Similarly, in *State v. Prince,* 93 Or App 106, 760 P2d 1356 (1988), there was evidence that, about a year before the affidavit for the search warrant was made, but after the defendant took possession of the premises, marijuana had been seen growing on the property. The defendant's conduct thereafter was consistent with a contining marijuana growing operation. In my view, the additional facts in *Prince* make the difference. In this case, there is no evidence connecting defendant's suspicious conduct with any illegal activity. More than mere suspicion is required before a search warrant may properly issue. *See State v. Anspach,* 298 Or 375, 380-81, 692 P2d 602 (1984).